## Campbell v. Commonwealth.

Oct. 22, 1943.

512

H. H. Owens for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

Appellant was convicted in the Knox Circuit Court of the offense of wilfully and maliciously shooting at another with the intent to kill, but without wounding him, it being one of the statutory offenses denounced in section 1166 of Baldwin's 1936 Edition of Carroll's Kentucky Statutes and section 435.170 (KRS). His punishment was fixed at confinement in the penitentiary for two years.

On this appeal appellant's counsel complains of a number of errors as sufficiently prejudicial to the rights of appellant to authorize a reversal of the judgment, in the majority of which we think he is correct; but we will discuss and determine only three of them which are: (1) Fatal variance between the indictment and the testimony; (2) error of the court in overruling appellant's motion for a directed acquittal made at the close of the Commonwealth's testimony and at the close of all the testimony; and (3) error in the instructions given by the court. They will be disposed of in the order named.

1. The basis of ground (1) is that the indictment charged that the weapon with which the shooting was done was a "pistol," whereas the proof showed that it was a more lengthy firearm shot from the shoulder and generally referred to as a "gun." This ground is not vigorously pressed and counsel admit that it may not be meritorious, which we conclude is correct. The statute

does not attempt to describe the character of weapon with which the shooting was done, but it is clearly indicated therein that the weapon referred to should be one discharging a deadly missile. Mr. Webster defines the word "pistol" as "A short firearm intended to be aimed and fired from one hand;" and the same authority gives as one of the definitions of the word "gun" "A revolver or pistol." They are each what is commonly known as shooting weapons, the distinguishing characteristic being that a pistol is shorter in length than what is generally understood as a gun and it is usually fired by holding it in one hand instead of from the shoulder of the one shooting it, and we take judicial knowledge of the fact that a pistol is frequently referred to as a gun. We therefore conclude that the variance contended for is without merit and the court properly overruled this objection.

2. The disposition of ground (2) calls for a substantial statement of the evidence. The defendant occupied a portion of a large dwelling house owned by his father with whom he lived. The front downstairs portion of the building was rented to and occupied by a Mr. Gibson and his family which included the dining room, back of which was the kitchen with a swinging door in the partition between them, the kitchen being a part of the premises reserved and occupied by the Campbells. Sometime in the late afternoon of Decmeber 22, 1942, defendant met on the streets a somewhat aged individual who said his name was Bijos and who was a Czechoslovakian. Since both of them were more or less addicted to the imbibing of alcoholic liquors and enjoying its immediate exhilarating effects, they proceeded to participate therein and became more or less intoxicated. In their ramblings upon the streets they were observed by the public and also that the foreigner was minus a leg and walked with crutches. They finally arrived, after darkness appeared, at the defendant's home and went into the kitchen, turning on lights, but the adjoining dining room, which was a part of the Gibson apartment, was unlighted. Before their arrival at the Campbell home a rumor started that the crippled foreigner was either a German or Japanese spy and someone who heard of the rumor telephoned the sheriff. He and his deputy, Bill Detherage, later appeared. They went to the Campbell residence, but defendant and his companion had not then arrived, but on a later visit they had

arrived and seated themselves in the kitchen. The sheriff and his deputy—the latter of whom is the one alleged in the indictment to have been shot at—went into the dark dining room where they could hear some talk between defendant and his companion, the crippled foreigner. The sheriff then pushed open the swinging door until the shutter was about at right angles with the wall, and he testified that he then said to defendant, "Kenneth, this is John Pickard (the sheriff), I am not going to bother you; I was called to come down here, that there was a German or Japanese spy." He stated that when entering the room defendant had a gun, with a long barrel to be fired from the shoulder and that he drew the gun on him (the sheriff) saying at the time, "Where is the G—— D—— S—— O— B——? I will kill him myself." He was asked, "Did you call on Kenneth to surrender?" and answered, "Yes, I told him several times to, that I wasn't wanting him." He later testified that he never did arrest appellant or anyone else on that immediate occasion. In the meantime Detherage remained standing in the dining room where it was dark, to the left of the swinging door and never came in sight of defendant who, as we have said, was in the kitchen. The sheriff left the kitchen and went around the house to a porch at its rear. In the meantime Detherage standing in a dark part of the dining room stumbled over a chair, or some object which made a noise, and defendant testified that when that noise was made he was demonstrating to his companion some part of the gun he had in his possession and he made a sudden and jerking turnaround, to discover what the noise was, when the gun accidentally fired. It was also fired, according to the testimony, before the officers arrived, which defendant admits and says that on that occasion the firing was accidental. An examination of the kitchen showed only two bullet holes, one in the floor, supposed to have been made by the first shooting before the officers arrived, and the second one was in a wall of the kitchen opposite to where Detherage was standing back in the dark dining room and some seven feet from the floor. Defendant and Detherage both testified that the former (defendant) never knew that Detherage had accompanied the sheriff to the scene, or that he was then present or in the dining room. The recitation of the testimony we have made contains all of the incriminating substance of the proof introduced by the Commonwealth.

It requires no argument to show that it made no case whatever to be submitted to the jury in the trial of the charge made in the indictment. On the contrary it showed that defendant shot at no one. He, perhaps, may have been guilty of the reckless use of firearms, which in turn was no doubt produced by his intoxicated condition. His reputation was shown by the Commonwealth to be good, except for his unfortunate habit of inebriety. Nevertheless, he and his companion, after the last shooting referred to, were each arrested and lodged in jail; but for some reason not shown in the record the crippled foreigner was later released and disappeared from the vicinity. However, defendant was indicted and charged with the offense of which he was convicted. We therefore conclude that the court erred in not instructing the jury to acquit defendant from which it follows that this error is found to be well taken.

The complained of error under ground (3) is perhaps more glaring than the one embodied in ground (2) supra. Instead of confining defendant's guilt to shooting at the person stated in the indictment (Detherage), with the intent to kill him, the court directed in its instruction, A-1, that the jury should convict defendant if it believed beyond a reasonable doubt that the shooting was done with the intention to kill Detherage ''or sheriff Pickard, or any other person then and there present, or shoot with such intention to kill any person, then and there, or in the direction in which he was firing his gun,'' and which was not done in the exercise of his right of self-defense, which was nothing less than the direction of a conviction if the defendant at the time of the shooting charged against him intended to kill not only Detherage but any other person present, or within reach of the charge fired, with whom it might come in contact. Furthermore, in another instruction the court told the jury that it was the duty of defendant ''when the sheriff called upon him at the time and place mentioned in the evidence to give up his gun and surrender himself peaceably and quietly and surrender his gun,'' if he at the time knew the sheriff, which carried with it the implication that if he, defendant, failed to do the things therein mentioned he would be guilty as charged in the indictment, notwithstanding defendant was not being tried for resisting arrest but only for the offense contained in the indictment.

The Assistant Attorney General who briefed this case freely admits, in discussing the instruction with reference to the person shot at, that "We are unable to see how in common justice an instruction like this could possibly have been given by the court." The writer thereof also admits that the instruction relating to defendant's duty to surrender himself and his gun to the sheriff had no place in the case and was flagrantly prejudicial. In closing, the brief says: "We cannot represent to this Court that this appellant should be convicted and deprived of his liberty for two years on evidence of this kind or nature. We see no reason why a peremptory instruction should not be directed to the court below if all of the evidence in the case is herewith presented." We find no grounds upon which to take issue with the Commonwealth's counsel in his conclusions referred to.

It has been facetiously said by this court that a defendant charged with committing a criminal offense was at least entitled to a "tolerably fair trial," but if that requirement so facetiously said was literally true and correct, we could not then sustain appellant's conviction, since he was not accorded under the well settled rules of practice even a "tolerably fair trial."

Wherefore, for the reasons stated the judgment is reversed with directions to sustain the motion for a new trial and should another one be had and the evidence be substantially the same as on this one, an acquittal should be directed.